# FILED

APR **0 7** 2017

**U.S. BANKRUPTCY COURT**
BY_____DEPUTY

In re: Kyle Jason McCarrell
Debtor

# 17-1050 D

| | | |
|---|---|---|
| Kyle McCarrell | § | IN THE UNITED STATES BANKRUPTCY |
| Plaintiff | § | COURT WESTERN DISTRICT OF TEXAS |
| V. | § | AUSTIN, DIVISION |
| | § | |
| | § | BANKRUPTCY CASE #: 17-10086-TMD |
| Ignite Restaurant Group | § | |
| d/b/a Joe's Crab Shack, & | § | ADVISORY CASE #: _____ |
| Providian Risk Management | § | |
| DEFENDANT | § | JURY TRIAL: NO |

## PLAINTIFF'S ORIGINAL PETITION

COMES NOW, Kyle McCarrell, and complains of the Defendant(s) Ignite
Restaurant Group d/b/a Joe's Crab Shack (hereinafter "Joe's), and Providian Risk
Management (hereinafter "PRM") for Violations of Federal & State Minimum
Wages, Extreme and Outrages Conduct, Severe Physical & Emotion Distress,
Gross Negligence resulting in personal injury and prolonged medical issues as a
direct result of the Defendant(s) actions and would show this court as follows:

### I.    JURISDICTION

1.     This Court has that jurisdiction over subject matter, and additionally over

this proceeding pursuant to 28 U.S.C. § 1334 and § 157(b)(2)(O) and 11

U.S.C. §105. 524, 727. This Court also has personal jurisdiction over the

parties to this  adversary proceeding.  This is a core proceeding under 28

U.S.C. §157(b)(2)(O).

2.     Additionally the Plaintiff is a resident of Austin, Travis County Texas;

and was employed by the Defendant Joe's in Austin, Travis County Texas, and both are under the jurisdiction of this Court; Defendant PRM is located in San Antonio, Bexar County, Texas again under the jurisdiction of this Court.

## II. Parties

3.)     Plaintiff, **Kyle McCarrell** is a resident of Travis County, Texas with a mailing address of 1712 E Riverside #300, Austin, TX 78741, and that all communications, notices, pleadings are to be served upon Plaintiff via email of **kyle.mccarrell73@gmail.com**

4.)     Defendant, **Ignite Restaurant Group d/b/a Joe's Crab Shack**, (hereinafter referred to as "Joe's") is a business operating within the State of Texas and conducting business at **600 E Riverside Dr, Austin, TX 78741**, and may be served with process at that location by serving any manager, director, agent, employee of said business entity.

5.)     Defendant, **Providence Insurance & Administrative Service (PRM)** is a business acting as the claims administrator for Defendant Ignite Restaurant Group d/b/a Joe's Crab Shack operating in the State of Texas and conducting business at 16414 San Pedro #800, San Antonio, TX 78232

## III.    FACTUAL BACKGROUND

6.)     That on April 23, 2015 the Plaintiff was working his designated shift at the Defendant's Joe's Crab Shack at 600 E Riverside Dr, Austin Texas 78741.

7.)     That during the course to the Plaintiff's server shift a customer came in an sat in the last booth before the walkway to the bar and back patio and proceeded to tell the Plaintiff what she wanted to order. The customer informed the Plaintiff that she did not need to look at the menu as her male

counterpart was already engrossed in as she knew exactly what she wanted. The customer described in full detail everything that came in the meal and then the Plaintiff entered the order into the computer system. When the orders arrived the Plaintiff took the food to the table; and served the guest their food.

8.) Plaintiff then proceeded to begin the closing duties which were assigned to the Plaintiff for that evening.

9.) Plaintiff after about 7 minutes returned to check on the customers in which the lady began complaining that this was not what she wanted although she had already consumed all of the queen crab and was complaining about the snow crab although she had already consumed over half of the snow crab that was in the bucket. The Plaintiff started to explain that this was the exact meal she had requested the Plaintiff bring her when the manager (Casey McElroy) on duty which the Plaintiff had previously dismissed sexual advances from began to intervene in the process and gave the customer and entire order of queen crab for free and apologizing to the lady customer for the Plaintiff's mistake and stated that the Plaintiff was new and still making some errors in placing orders. While doing closing duties by bringing glassware to the bar Plaintiff overheard the lady customer tell her male counterpart "I told you I'd get us free crab, see it's just that easy."

10.) Joe's manager Casey McElroy then dismissed the Plaintiff from his duties of waiting on his last two customers of the evening in which Mr. McElroy then took over the process of waiting on that last table of the Plaintiff.

11.) Joe's Manager Casey then spoke with Sean a regular closer on the night shift in which Sean added for the Plaintiff to clean the rotunda floor which

is basically the employee some dry goods storage, and soda machine area, and comes directly off of the kitchen where butter is frequently spilled on the floor. The floor of the rotunda is supposed to be red brick; however, with all the grease from the butter, food, rat droppings, and just general neglect needed according to Sean special cleaning with degreaser (See internal communication EXHIBIT "A" from Joe's Manager Alvarado stating to order degreaser). The business was attempting to pass a health inspection during this time the bar scored an A the restaurant overall did not.

12.) Joe's employee Sean was upset that the Plaintiff had never been shown how to clean the rotunda floor with degreaser, and instructed the Plaintiff to use the degreaser in a bucket and pour it on the floor, then use a squeegee to push the dirty solution into the floor drain in front of the ice maker.

13.) An unidentified individual unknown to the Plaintiff offered to assist the Plaintiff by getting the chemicals from the back of the kitchen and spreading them on the floor for the Plaintiff which Plaintiff gladly accepted the help, as it was already closing time and the Plaintiff had to catch the bus home.

14.) The Plaintiff believed that the person helping the Plaintiff with the floor cleanup was an employee but could not be for certain as the Plaintiff never saw this individual again; however he did speak to several people that night about a party in which there was going to lots of alcohol and favors there.

15.) This individual spread the chemicals on the floor and sloshed the chemicals supposedly accidently on the Plaintiff's shoes. Plaintiff was told

by the individual not to worry about it, and the Plaintiff took that statement at face value.

16.) The Plaintiff made the last bus that would take him to his residence at the time which was in north Austin. The whole time period from when the Plaintiff left Joe's until the time that the Plaintiff arrived home was approximately 3 hours; due to extra duties the Plaintiff had already missed the last bus for the stop by Joe's and was forced to run across town to the bus stop on Lavaca Street downtown.

17.) The Plaintiff on his way home began to notice a burning sensation occurring in his feet and initially dismissed it as just being tired; however, upon reaching the Plaintiff's residence the burning sensation kept getting worse and more intense. Plaintiff walked from the bus stop on metric to the Plaintiff's house and then the Plaintiff took off his shoes and socks once inside his residence where the the Plaintiff discovered that the skin on his toes was essentially melting off his toes. Some of the Plaintiff's skin just came off with the removal of the Plaintiff's socks.

18.) Plaintiff realized that the chemicals in which the Plaintiff had been exposed to had soaked thru the Plaintiff's shoes and socks and were now giving the Plaintiff chemical burns.

19.) Plaintiff rushed upstairs where the Plaintiff encountered Plaintiff's roommate Noah Moore and Mr. Moore was in shock about how bad the feet/toes looked and asked the Plaintiff if he could do anything.

20.) Plaintiff informed Mr. Moore that the Plaintiff was going to jump in a cold shower and let that get rid of the chemicals then the Plaintiff would take care of the issue with Neosporin because with at that time dealing with

identity theft and bankruptcy the Plaintiff did not have the funds to go to the emergency room.

21.) At this point it was already 3 A.M. with the Plaintiff having to return to work the next evening and with the damage that had occurred on the Plaintiff's feet the Plaintiff just went to bed, after taking pain medication.

22.) The Plaintiff got up earlier than normal on the 24th to dress the wounds and insure that the Plaintiff would have dry socks during the shift to wear which the Plaintiff was planning on attempting to work.

23.) Plaintiff quickly discovered that the Plaintiff was going to have to take excessive amounts of pain pills to manage the pain emanating from the wounds caused by the exposure to the chemicals.

24.) Plaintiff made it to work on time and went directly to the officer where the General Manager Scott [     ] and Manager Casey McElroy were seated having a discussion about orders followed by a conversation about upcoming mother's day work schedule.

25.) Plaintiff informed the to managers that the Plaintiff had found out what happens when you get chemical burns on your feet from the degreaser. The Plaintiff asked management if they wanted to see they dismissed the Plaintiff stating that they didn't want to look at gross shit.

26.) The Plaintiff later found out thru internal communications between Mr. McElroy and Mr. Nuerenburg that Mr. McElroy was going to write the Plaintiff up for costing the restaurant money on doing the incorrect order on the last meal in which Mr. McElroy took over and provided at no charge to the customer; but apparently after the two managers learned of

the chemical burns they decided not to write the Plaintiff up for that occurrence.

27.) Neither manager started a claim form or gave the Plaintiff instruction on how to proceed, and the Plaintiff for several days continued his attempt to treat the wounds. Each day the Plaintiff was getting sicker due to the infections setting into the wounds.

28.) On Wednesday April 27, 2015 the Plaintiff approached the General Manager and informed said general manager that he needed to leave and go to the Emergency Room that the Plaintiff felt like passing out. Plaintiff was informed that he could not leave although the business was slow the expected a "pop" any minute and since they were short staffed the Plaintiff would have to stay.

29.) The Plaintiff was off the next day, however as a result of the identity theft, and bankruptcy the Plaintiff had lost his residence and been evicted so the Plaintiff ended up fighting thru sickness and pain in order to save some of his personal belongings.

30.) Plaintiff then began couch surfing for a little time period and living out of a U-haul Van and attempting to still work for a few more days. The following Sunday when the Plaintiff went into work the Plaintiff was severally ill and had actually vomited a couple of times while at work.

31.) Plaintiff approached Manager Rafael Alvarado and told him what the situation was currently at that point and then actually showed Mr. Alvarado what the situation was with the Plaintiff's feet to which Mr. Alvarado stated that the Plaintiff needed to go to the hospital and get checked out that the Plaintiff might have blood poisoning. Even at this point was there a point the Defendant's staff informed the Plaintiff of the

procedure or policy in regards to the procedures for completing a claim thru their insurance carrier PRM.

32.) Plaintiff was required to work approximately 2 more hours longer and released to go seek medical care. Plaintiff went to Texas Med Clinic in Southpark Meadows. It was at this point that the Plaintiff was seen by medical staff and then sent to the St. David's Medical Hospital Emergency room by way of his own transportation. The Med Clinic gave the Plaintiff a work form preventing the Plaintiff from working for a minimum of 7 days.

33.) At the Medical Center Emergency Room the Plaintiff was treated and given Liviquin a very strong antibiotic. The staff told the Plaintiff to keep off his feet as much as possible. Then proceeded to tell the Plaintiff to come back every 24 hrs until the Plaintiff could be seen by a wound care specialist. Additionally that the Plaintiff should wash the area and keep it clean and dry as much as possible and not to use alcohol or peroxide to clean the wounds as this would destroy new growth tissue and cause delay in healing.

34.) Plaintiff took the doctor's note to Joe's the next morning and gave to the General Manager; who was very upset that the Plaintiff could not work and began to berate the Plaintiff about how this could happen and that he needed all staff for the upcoming mother's day event. Plaintiff informed the General Manager (GM) that he would do his best to be available to work that weekend as the Plaintiff needed the money. Joe's GM went on to tell the Plaintiff about how much money would be made that weekend and that he needed the Plaintiff so that they would not be short handed.

35.) The Plaintiff continued to treat the wounds as directed by emergency room personal and was then contacted by Lisa at PRM. She instructed the Plaintiff that the Plaintiff had to attend all doctor appointments and settings regardless of work schedules or other events as if the Plaintiff missed any of these the Plaintiff's claim could be denied for failure to attend or comply with doctor's orders.

36.) The GM contacted the Plaintiff via telephone and asked if the Plaintiff had been cleared to go back to work as he really needed all hands on deck for the mother's day weekend. The Plaintiff informed the GM that the Plaintiff intended to go to the doctor later that day to see what he could accomplish in that matter. The Plaintiff then proceeded to see one of the physicians at Texas Med Clinic who gave the Plaintiff a partial release in which restrictions were in place preventing long standing times, lifting over 10 lbs, taking breaks, cleaning the wounds, and general care instructions, which included but not limited to the aforementioned.

37.) The Plaintiff was then put on the schedule to come in an open on Saturday morning in which the Plaintiff complied with the scheduling. The Plaintiff was the kept on the clock without breaks from 9:30 AM until after closing. During this extensively long shift the Plaintiff was required to lift repeatedly 40 lbs of ice to restock the bar, carry glassware from the kitchen to the bar weighing anywhere from 10 to 30 pounds, lift tables to move for parties, take out trash to outside dumpsters weighing in excess of 100 lbs, and the Plaintiff notified the GM of the restrictions and the GM's response was well you're the only one we have on the Clock so you are going to have to do it. At no point during this shift was the Plaintiff afforded to take a break in which is also customary to have a break between shift when pulling a double.

38.) After other servers came in and the Plaintiff could slow down, but not actually take a break as the GM seen specifically to that issue as each and every time that the Plaintiff attempted to take a break the GM would find some other project to have the Plaintiff complete; including but not limited performing cleaning duties normally assigned to the closing staff in the evening, washing dishes, and restocking the bar regardless if the bar staff wanted or needed the items; and additionally removing trash from the bar area and back storage areas. It was at this point when one of the kitchen staff cooks arrived named Kyle Adams in which the GM and Kyle joked out loud about, whereas the Plaintiff overheard, as they were unaware that the Plaintiff was in the rotunda getting drink orders; Mr. Adams stated that he loved that degreaser it would take the meat off the bone. When the Plaintiff stepped around the corner after this comment the GM abruptly went back to the walk in cooler and Mr. Adams followed suit.

39.) The Plaintiff was schedule multiple times to visit the doctor in regards to treatment and after the last visit to the emergency room while still employed with the Defendant Joe's the Plaintiff was given an oral prescription for an antibiotic and pain killers.

40.) Plaintiff was instructed to and gave the written doctors' instructions to the management of Joes about restricted activities. When the Plaintiff was visiting and under the care of Southwest Orthopedics Group the doctor that seen the Plaintiff got on the Phone with Lisa with PRM and was very irate that PRM had not arraigned to have the Plaintiff visit a wound care specialist. Plaintiff was even given written instructions that he gave to the Joe's management, on duty at the time, Mr. Alvarado in which prohibited any an all work activities. After leaving the Southwest Orthopedics group Plaintiff was contacted by Lisa from PRM via her cell phone at which point she instructed the Plaintiff to retain counsel as Lisa deemed that the Plaintiff was getting jerked around and that with the assistance of legal

counsel could possible get the help that the Plaintiff needed. This was a recorded conversation on the Plaintiff cell phone.

41.) Plaintiff took the doctor's directive to Joe's on duty manager who stated and informed the Plaintiff that he would have to work as they were short staffed and that the District Manager was currently here; therefore the Plaintiff would have to work thru the remaining part of his shift. Mr. Alvarado stated to the Plaintiff how do we know that you just didn't get that document off of the internet. Plaintiff informed Mr. Alvarado that the Plaintiff was following Joe's insurance company's rules and regulations about the Plaintiff's care and that Mr. Alvarado could contact their carrier as PRM had gotten all of the documents from the doctor's office in regard to the care directives. Mr. Alvarado simply stated that he was told by the GM to have the Plaintiff complete the assigned shift so that Joe's would not be short staffed. During this time period the Plaintiff only was seated 2 times as Joe's business was not adequate to handle the number of servers on duty. Plaintiff was instructed since it was slow to do dishes in the back as the dishwasher had not shown up and they needed clean dishes for the guest. Plaintiff spent a good portion of his time there doing dishes until the dishwasher came in, and the Defendant did not pay the Plaintiff the hourly pay for a dishwasher but instead the hourly rate for a server.

42. The Plaintiff received a phone call from Lisa from PRM while he was working the remainder of his shift to which Lisa was a little taken back as she was aware of what the restrictions detailed on the doctor's order, and Plaintiff was informing Lisa of what the on duty manager stated to the Plaintiff. While Plaintiff was on the phone with Lisa the other on duty manger Mr. McElroy came thru the rotunda and seen the Plaintiff on the phone and told the Plaintiff to get off the phone or he would take it from the Plaintiff to which the Plaintiff replied that Plaintiff "would like to see

him try it" as the Plaintiff was not scared of him and he could deal with the fact that it was Joe's insurance provider who he was scheduling the Plaintiff for a doctor's visit with Arise Medical Clinic; and that Plaintiff welcomed at this point any attempt by Mr. McElroy to take the Plaintiff's phone from his person. Mr. McElroy then stated to the Plaintiff to just hurry up and then scampered back into the kitchen and then started a conversation with the kitchen cook Kyle Adams this conversation the Plaintiff overheard while on the phone with Lisa was about the fact that Mr. McElroy didn't get paid that much but when he didn't have money all he had to do was come eat at Joes and use his free meal.

43.　　The Plaintiff then later observed in the same night as the paragraph 42 the kitchen staff using the degreaser on the kitchen floor; however, the staff were wearing rubber boots; and then the Plaintiff observed that the closing staff was using a mop bucket and a mop to clean the rotunda floor in which the individuals were using mopping solution or some other solution that was sudsy with a water base (the solution did not appear to have the same cleaning or removal power as the degreaser that the Plaintiff was exposed to while cleaning the floor).

44.　　The Plaintiff was informed by Lisa at PRM to be ready to leave around 5 AM for the visit to Arise Wound Care as it was a 2.5 hour drive from where the Plaintiff was staying at Motel 6. PRM had arraigned for transportation to pick up the Plaintiff at the motel take him to and from his appointment. The individual responsible for transportation contacted the Plaintiff asking if it would be alright to pick the Plaintiff up at between 7:15-7:30 as it was in Manor and not Menard as PRM had informed the Plaintiff, and additionally the office would not be open at such an early hour as the driver frequently made trips for appointments to that location. Plaintiff agreed to the change in pickup time easily.

45. Plaintiff was informed by the staff that I was a last minute squeeze in as they were already booked; however, the referring doctor stated that this was an emergency situation so they accepted me as such. The doctor with Arise spent a great deal of time working on the Plaintiff's feet, and after much work and then bandaging the Plaintiff's feet the Plaintiff was given detailed instructions about care with a doctors notice given to the Defendant Joe's and according to Arise Personal the Defendant PRM was also faxed the same care instructions.

46.) The Plaintiff was instructed by the doctor that the Plaintiff could return in limited capacity. The Plaintiff gave this limited restrictions about what the Plaintiff could and could not perform during the course of his shift with the Defendant Joe's in direct violation of these restrictions the Defendant Joe's Management did knowingly instruct the Plaintiff to do the following:

a.) Work in excess of 2 hours without a break;

    i.) The Defendant Joe's GM witnessed the Plaintiff sitting and caring for his wounds prior to his shift, then stated he "was tired of this shit" then removed the break table and the chairs from the rotunda thus taking away any area that the Plaintiff could tend to his wounds or for anyone to take a break.

    ii.) On numerous occasions in direct violation of the care instructions given to Defendants the General Manager instructed the closing staff to have the Plaintiff climb up in chairs to clean lamp shades. This was not only against the doctors orders of climbing and exterting unnecessary strain on the wounds, but also violates OSHA standards as well as the chairs are not tools authorized to perform such tasks.

    iii.) On many numerous occasions the Plaintiff was instructed to wash dishes where there was standing water. On one

instance the water backup was due to a rat that had drowned in the drainage pipe. Plaintiff was not paid at any point and time the hourly wage for a dishwasher when being required to do dishes. After a certain point Plaintiff flat out refused to do the dishes because of the standing water issue, and it was at this point the employee Heidi informed the Plaintiff she was instructed by management to have the Plaintiff do dishes and that the Plaintiff would do the dishes as she was not going to argue with the Plaintiff about the issue. When this occurred the Plaintiff went and clocked out as the Plaintiff knew that this was continually violating the doctor's orders, and management was aware of these directives. After clocking out the Plaintiff told the manager on duty that he was not washing dishes period to which he responded that was the task I told Heidi to give you, Plaintiff interrupted the manager at this point and told him that the doctor's directives clearly state to keep the wounds dry and that the Plaintiff wasn't doing dishes and that the Plaintiff had clocked out and was going home as he had not been given any break during the Plaintiff's shift, and the Plaintiff could tell that his feet were bleeding and needed tending to. The Manager stated that the Plaintiff should just go home.

iv.) That the Defendant repeatedly attempted to force the Plaintiff to wait outside on the patio in the heat which would cause the Plaintiff to sweat; and therefore would cause the Plaintiff's wounds would become sweaty and inflamed, thus becoming more painful. When the Plaintiff refused to work on the patio area the Plaintiff would then

be assigned the lowest grossing area for the restaurant by what was or is referred to as the party pen. This area was the least sat in the restaurant and the Plaintiff was often time passed in rotation for being sat guests thus reducing the amount of money the Plaintiff would make during the course of the Plaintiff's shift.

v.) Plaintiff when was sat guest in this in less desirable area often time the guest's meal were often comp'ed due to the guest seeing rats in the restaurant thus further reducing the amount that the Plaintiff would make in tips. At one point the employees of the Defendant were attempting to name give names to the various rats as at the end of the evening the rats would come down from the ceiling down pipes into the kitchen area, the rotunda down to the lines to the ice machine and down to the shelving, coming out from under the seats in the dining area. This was especially worrisome to the Plaintiff as the water in which the Plaintiff had been standing was definitely concentrated in rat feces and urine which could let to worse infections as the Plaintiff had been required to perform his duties in this tainted environment.

vi.) The Plaintiff was required to clean up the dry goods area of the rotunda in which the coffee mugs all had to be emptied of rat dropping and washed, the sugar packets, sweet & low packets, and other sweeteners were or had been urinated on by the rats in which the Plaintiff was instructed to sort the packets and remove the ones that hadn't been urinated upon and place those packets into a new container and throw the rest away. This although the packets that were in the new container those packets

were probably in-fact contaminated as well but showed
no outward appearance thereof.

vii.) The Plaintiff would show that the working conditions
the working conditions of the Defendant's restaurant under
the management that was in place at the time were so
bad that one employee attempted to commit suicide by
drowning herself in the lake during her shift and was saved
by a fellow employee. See internal communications
attached hereto. This entry was made on 4/28/15 by
Casey McElroy.

viii.) The Plaintiff would also show that initially the Plaintiff
was keeping the required medications in the office of the
Defendant in which the Defendant after becoming aware of
the medications that the Plaintiff was taking required the
Plaintiff to move his backpack containing the meds to
the general area where anyone could have access to
the backpack during work. At the time this the Plaintiff
was already aware of thefts that have occurred on the
property see internal communications regarding theft,
although the Defendant was aware of this the Defendant
still insisted that the meds be located outside of the office.
Shortly after the Plaintiff moved the meds to the rotunda
his meds were stolen along with the Plaintiff's tablet. The
Defendant's lied in discovery in the Case filed against the
Defendant Joes in the Justice of the Peace in regards to
thefts occurring at the property. See attached Discovery
answers submitted by Defendant Joes. The General
Manager sent a communication entitled Thief Among Us

(additionally the Defendant denied the thefts on the property in the discovery request in the other civil action).

ix.) That the General Manager made it fully aware that there were camera in the facility and that he could watch the employees from his phone in other words by his own admission he would have been able to see the thefts of personal property as the facility was recorded and available on the General Manager's Phone (See bar policy update memo attached hereto).

x.) Plaintiff would show that the General Manager instructed employees to falsify amounts of product being rang up to the customer in which would also alter inventory amounts showing that the Defendant's management would go thru extreme lengths to lie on corporate records, and discovery that would falsify information about the Plaintiff to the named insurance provider PRM the second named defendant who denied the Plaintiff's workman's compensation claim. See inter memo House Notes, and discovery responses.

xi.) That the Defendants' were both served with certified letters from the Plaintiff's care provider to gain information about the chemical degreaser that the Plaintiff was exposed to. Both requests went unanswered and the Defendants would not disclose the chemicals that the Plaintiff was exposed to thus intentionally thwarting the Plaintiff's recovery.

xii.) That the management has a history of lying to employees as evidence by the internal communication from Stephanie

Sherfield to management in the attached communications as management stated to Plaintiff that the this employee had quite. See internal communications to management dated 5-5-2-15. Later in the conversation the Defendant changed the statement of her quitting to a misunderstanding; however, management never changed the story but that they stated they re-hired that employee.

xiii.) That due to implementations on new "policy" about bringing one's own bank which most people do not have change to break large bills and given the already recognized theft on the property Defendant's policy encourage more thefts to take place while not taking pro-active measures to prevent the thefts. See inter-memo Dated 5-23-2015.

xiv.) Further would show the treatment of employees by Daniel Field dated on 5-25-2015 where management had taken away his shifts after Plaintiff observing that particular employee covering multiple shift for individual that either had not shown up or showed up late, especially in the kitchen area. The this employee floated over various positions of the Defendant thru the course of the evening filing in as needed only to have his shifts the following days taken away.

xv.) Entry on 4/20/2015 demonstrates that Defendants management has a repeated pattern of attempting to get employees to work for free or at reduced pay wages as management in this case attempting to get an employee to work off the clock instead of

like what the management was doing to the Plaintiff
in having the Plaintiff perform dishwashing duties
at a servers pay instead of at the pay rate of a
dishwasher.

xvi.) In the entry made by Casey McElroy, in which the
Defendants stated to their insurance carrier that the
Plaintiff was not working is directly contradicted by
his entry, on the 04/24/2015 in the internal memo records
shows that the Defendant was planning on writing the
Plaintiff up for supposedly ringing up food at the
wrong table.

xvii.) Entry made by Casey McElroy shows the rat problem
within the restaurant on the 04/25/2015. The reply by
the general manager on the clearly shows there is an
ongoing battle with the "vermin".

xviii.) Entry made by Casey McElroy on 5/2/2015 shows
that the Plaintiff got into argument with another
employee "Ella" in which the Plaintiff told Ella
"Fuck Off" as the Plaintiff who was not on pain
meds at the time and being required by Management
to assist another employee "Odis" to move tables
back into the main dining area past the time that
the Plaintiff was already supposed to be off of his
shift, and additionally missing breaks as the breaks
were not afforded to the Plaintiff at any point and
time to re-dress his wounds; however, Ella was
in the back area discussing as the Plaintiff had passed
by many times while the conversation was taking

place about her instructing her boyfriend Kyle A. what crab to put together for them to take home and fix for for their dinner. Plaintiff brought the theft of the product to the attention of management who in turn took no action. This employee who was doing nothing but milking the time clock told the Plaintiff that he was going to have to do additional side work because the manager (Casey) had instructed her to give the Plaintiff more work before the Plaintiff could leave although it was already past the time for Plaintiff to have clocked out.

xix.) Entry by Rafael Alvarado (manager) on 5/9/2015 demonstrates that even management had come up with nick names for the rats calling them "Henry's Kids". Additionally in the same entry it reflects that the same manager comp'd the whole check of the Plaintiff's table and the table did not tip the Plaintiff so the whole hour the Plaintiff spent assisting those guest was for nothing; however, I did remember seeing the mother's face and she was terrified even had put her feet in the seat of the booth.

## CAUSES OF ACTION
## COUNT I
### Federal Minimum Wages Violations

47.) Plaintiff alleges and re-allege the paragraph above.

48.) Defendant knowingly, willfully, and intentionally failed to compensate Plaintiff the applicable minimum wage in violation of 29 U.S.C. § 206(a) when the Defendant had Plaintiff performing duties as

a dishwasher at the rate of server pay.

49.) Defendant also willingly required the Plaintiff to provide his own "bank" a/k/a tools to complete the Plaintiff's job which further reduced Plaintiff's wages below the minimum hourly wages in violation of 29 U.S.C. §206(a) and applicable regulations under Texas Labor Codes.

50.) Because of Defendants' willful violation of FLSA, Plaintiff is entitled to recover from Defendants, jointly and severally, his unpaid minimum wages, and equal amount in the form of liquidated damages including prejudgment interest pursuant to FLSA, all in an amount to be determined at by judicial process.

## COUNT II
### State Minimum Wages Violations

51.) Plaintiff allege and re-allege the paragraphs above.

52.) Defendants knowingly, willfully, and intentionally failed to compensate Plaintiff the applicable minimum hourly wage in violation of Texas Labor Code Chapter 62, as the Defendants had the Plaintiff performing duties on a servers pay ($2.13 hr) instead of that of dishwasher pay.

53.) Defendants also willfully required Plaintiff to provide a "bank" for the Plaintiff to perform his job duties in carrying out his assigned duties in violation of Texas Labor Code. The necessity of the Plaintiff carrying his own personal bank further reduced the hourly wages that was paid to Plaintiff.

54.) Pursuant to Texas Labor Code an employer who willfully fails to pay wages required by the Minimum Wage Act shall be liable, in addition to the amount of any under-payments, for liquidated damages equal to twenty-five percent of the total of such under payment found to be due the employee.

55.) Because of Defendants' willful violation of the Texas Labor Code, Plaintiff is entitled recover from Defedants, jointly and severally,

Plaintiff's unpaid minimum wages and an amount equal to twenty-five percent of his unpaid wages in the form of liquidated damages, as well as costs of the action, including prejudgment interest, all in an amount to be determined by the court.

## COUNT III

### Unjust Enrichment

56.) Plaintiff alleges and re-alleges the paragraphs above.

57.) Defendants have been enriched by the value of Plaintiff's unpaid labor as a dishwasher.

58.) Defendants have been enriched by the value of Plaintiff's required personal bank incurred during the course of Plaintiff's assigned duties by the Defendant.

59.) The enrichment was at the Plaintiff's expense because the Plaintiff was forced to perform dishwasher duties and the expense of carrying a personal bank to make change for the Defendants' business operations; and in and for Defendants' exclusive benefit.

60.) The circumstances were such equity and good conscience require the Defendant to pay Plaintiff for all the expenses incurred in the course of completing the Plaintiff's assigned duties.

## COUNT IV

### Extreme and Outrageous Conduct

61.) Plaintiff alleges and re-alleges the paragraphs above.

62.) The Defendant's conduct was extreme and outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency as to be regarded as atrocious and utterly intolerable in a civilized community. In particular the conduct was outrageous because the Defendant knew the Plaintiff was injured and had wounds to care for, under doctors care and yet still continued to force the Plaintiff to perform work duties that violated the doctor's orders attached in Exhibit "A". That the Defendants

knowingly falsified information to the insurance carrier as to the Plaintiff; specifically the Defendant Joes informed the insurance carrier PRM that the Plaintiff was not working on the date that the Plaintiff was injured.

63) Although the Defendants were notified of the restrictions in which the Plaintiff had been placed on specific restrictions and continually forced the Plaintiff to work in violation of those orders.

## COUNT V
### GROSS NEGLIGENCE

64.) Plaintiff alleges and re-alleges the paragraphs above.

65.) Defendant failed to followed OSHA guidelines and other workplace safety rules when the Defendants staff instructed the use of degrease for the use of cleaning the rotunda floor.

66.) The Defendant failed to exercise a Duty of Care where the Defendant mislead the Plaintiff in believing the solution that the Plaintiff was using to clean the rotunda floor. Plaintiff was never provided the Material Data Safety Sheets on the chemical degreaser that the Plaintiff was exposed to even after the Doctor's office sent certified demand letter to determine the proper course of treatment.

67.) Defendants failed to continue and stopped treatment of the Plaintiff's wounds that were obtained while at work, and by such caused the Plaintiff was forced to endure the wounds on his feet for over a year until the Plaintiff changed law firms who instructed the Plaintiff to seek out professional medical care to assist in the healing of the Plaintiffs wounds.

## COUNT VI
### PAIN, SUFFERING & EMOTIONAL DISTRESS

68.) Plaintiff alleges and re-alleges the paragraphs above.

69.) Plaintiff asserts that he is entitled to compensation for pain and suffering that the Plaintiff was forced to endure while working in violation of doctor's orders.

70.) Plaintiff asserts that the Plaintiff entitled to compensation for pain and suffering as a result of the pain and suffering that the Plaintiff had to endure after denial of the Workman Compensation Claim and termination of employment for the duration of over a year.

71.) Plaintiff asserts that the Plaintiff is entitled to compensation for the disfigurement, nerve damage, and future pain and suffering resulting from the chemical burns.

72.) Plaintiff assert that the Plaintiff is entitled to compensation for the emotion distress that was caused by the chemical burns. The Plaintiff suffered from depression, continued frustration from dealing the constant pain associated with the chemical burns and wound care. Plaintiff had to endure pain at or above level 7 for over an entire year. The pain from having to continue to walk on the wounds preventing the healing process and the lack of medical attention. The only way at multiple the Plaintiff could sleep due to pain was to ration out pain killers that had been prescribed to the Plaintiff. The Plaintiff was forced to give up part of his enjoyment of walking his dogs as a part of his daily life during this time period, and has caused further loss of enjoyment of life resulting from continued pain from walking on the Plaintiff's feet, and continue pain and cramps that began after the chemical burns.

73.) Plaintiff has had to endure severe cramps in the Plaintiff's feet and legs which often times is so intense that wakes the Plaintiff from sleep making the cry in pain, and the only way to stop the pain is to force the Plaintiff out of bed and place pressure on the Plaintiff's foot and leg and stretch out the muscles in each while being forced to deal with the pain.

74.) The Plaintiff was prescribed medication for depression and insomnia as a result of the pain caused from the chemical burns and lack of medical care for the extended duration of time. That additionally because of the ongoing infections the Plaintiff was forced to use additional amounts of insulin going from using 20 units to 45 units as a direct and proximate

result from the chemical burns.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully request this Court to grant the Plaintiff the relief as follows:

1.) Declaring the Defendant's conduct complained of herein to violation of Plaintiff's rights under the FLSA, and Texas Labor Code;

2.) Declaring that the Defendants' conduct complained herein to constitute illegal acts;

3.) Order to pay Plaintiff's wages for the work Plaintiff performed at the time required by the law and at the same time as other employees, and compensate Plaintiff at a rate or equal to or greater than minimum wage for the time in when performing dishwasher duties;

4.) Awarding Plaintiff all compensatory damages under FLSA and Texas Labor Code and associated regulations;

5.) Awarding Plaintiff all economic damages and compensatory damages under 42 U.S.C. §1981 and the Texas Labor Code;

6.) Awarding Plaintiffs liquidated damages;

7.) Awarding Plaintiff pre-post judgment interest.

8.) Awarding Punitive Damages;

9.) Awarding Plaintiff damages for gross-negligence against the Defendant in the amount of $250,000.00;

9.) Awarding Plaintiff damages for pain and suffering against the Defendant in the amount of $250,000.00;

10.) An Immediate Order Instructing the Defendant to immediately satisfy all outstanding medical debts listed on Plaintiff's bankruptcy schedule related to Plaintiff's Injuries;

11.) Ordering such other and further relief that this Court deems just and proper.

Dated this the 7 day of April 2017,

Respectfully submitted,

Kyle McCarrell
Plaintiff
1712 E Riverside 300
Austin, TX 78741
512-507-9441 Phone
kyle.mccarrell73@gmail.com

State of Texas    }
County of Travis}

Before me, Kyle McCarrell on this personally appeared before me and known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged before me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office on this the 7 day of April 2017.

Notary Public
State of Texas

RICHARD M. WHEELER
Notary Public, State of Texas
My Commission Expires
SEPTEMBER 27, 2017

**FILED**

| | |
|---|---|
| **ADVERSARY PROCEEDING COVER SHEET**<br>(Instructions on Reverse) | **ADVERSARY PROCEEDING NUMBER**<br>(Court Use Only) |

U.S. BANKRUPTCY COURT
BY_____DEPUTY

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Kyle McCarrell | Ignite Restaurant Group dba Joes Crab Shack et al |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| | **17-1050-D** |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☑ Debtor ☐ U.S. Trustee/Bankruptcy Admin | ☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin |
| ☐ Creditor ☐ Other | ☐ Creditor ☑ Other |
| ☐ Trustee | ☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

## NATURE OF SUIT
(Number up to five (5) boxes starting with lead of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) -- Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☑ 14-Recovery of money/property - other

**FRBP 7001(2) -- Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) -- Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) -- Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) -- Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) -- Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) -- Dischargeability (continued)**
☐ 61-Dischargeability -§523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) -- Injunctive Relief**
☐ 71-Injunctive relief – reinstatement of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☑ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☑ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $   500,000.00 |

Other Relief Sought

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Kyle McCarrell | | BANKRUPTCY CASE NO.<br>17-10086-TMD |
| DISTRICT IN WHICH CASE IS PENDING<br>Western | DIVISIONAL OFFICE<br>Austin | NAME OF JUDGE<br>Davis |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>4/7/17 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Kyle McCarrell | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, if it is required by the court. In some courts, the cover sheet is not required when the adversary proceeding is filed electronically through the court's Case Management/Electronic Case Files (CM/ECF) system. (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and the defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and in the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is *pro se, that is, not represented* by an attorney, the plaintiff must sign.